Good morning. My name is Margaret Cates. I'm an assistant federal defender in Albuquerque and I represent Mr. Blackburn. We raised two issues in our appeal. We raised the illegal seizure of his cell phone and we raised the issue of the Miranda violations that occurred during his custodial interrogation. With respect to the Miranda violations, the video that is an attachment and is part of the appeal can make the argument way better than I can. The video is only two minutes long, but it shows pretty dramatically how egregious the violations are. It starts out, when you watch the video, there are two agents, Agent Breen and Officer Sabow, and they're there to interrogate Mr. Blackburn, who's been waiting for them for approximately four hours in a locked room. Agent Breen hands him a piece of paper and it is apparently the advisement of rights, but first of all he refers to it as the waiver form, first mistake. And then Agent Breen says, I need you to read this before we go into our questions. Sort of a foregoing conclusion that that's the next thing that's going to happen after you read this, we're going into questions. He then hands him the piece of paper, Agent Sabow starts talking to him, and then Agent Breen starts talking to him, and literally there is not a moment of silence where Mr. Blackburn can actually read and most critically understand the Miranda warnings and what it would mean to waive them. Then Agent Breen says, I just need you to have these, to be aware of them. That's not what's required. I don't understand them. I'm aware of quantum physics, but I don't understand them. So the next thing that Agent Breen then says is, if I can get you to sign these, that you've received them. Again, that is not what's required, that you indicate that you've received these warnings. These warnings shouldn't be diminished by the fact that they're on TV and people think that they know what they are. They're very specific. The court in Miranda recognized the inherent coercive circumstances of being interrogated by the police, specifically in this situation, after four hours, being locked in a small room. The court, recognizing how coercive those circumstances are, have instructed in the Miranda decision that an individual, before they give up their right to remain silent, their right against self-incrimination, should be instructed that they don't have to speak to law enforcement, and that if they do speak to law enforcement, what they say can be used against them. So are you contesting that the, you're happy with what the paper actually said. You're not contesting that, are you? That's correct. I think the paper itself was fine. The question is, did he ever read it and did he understand it? And the argument is that it was virtually impossible for him to have read it, and he clearly didn't understand it. And then just following up on that then, I mean I guess I'm wondering what the rule of law you're wanting us to hold, that there has to be a specific amount of time given to the defendant to read it, or I guess I'm just trying to figure out what should have happened in your view here. What are you asking us to hold? Well, so we're asking this court to follow the Miranda decision and the decisions that to knowingly and intelligently and voluntarily waive your rights. And I don't know there's a bright line rule, how much time there is. The bottom line is, did he understand the rights? Well, the bottom line is you want us to write a rule, and that's the bottom line. And I'd like to hear your explanation as to how you would have the Miranda warning as to time and sequence and knowledge, how you would have us write that and expanding on Miranda. Okay, well I think the issue is here and that we could address is, as you stated, that the way they're actually written follows the Miranda decision and those are correct. The question is how are they conveyed to the individual? And they can be done in writing, they can be done orally. The problem here is they tried to do it both ways. They handed him the form and then basically didn't let him read it, and then they started telling him partially his rights, but didn't tell him correctly what his rights were. They never mentioned the fact that... Let me ask you, so you're saying handing him the form is all right? That is... handing someone the form, there's not a problem with that, unless they can't understand it, unless there's some indication that they can't read it. And in this case, we're not arguing that he doesn't know how to read. We're arguing he didn't have a chance to read. If you look at that video, I don't care how sophisticated you are and educated you are, you couldn't read those 100, whatever, I think it's 114 words of the rights and 57 words of the waiver. You just couldn't do it. But the problem is, so they're talking to him the whole time, that's the first issue. So I think in this case, you have to almost set aside the form, because he never read the form. And you have to go based on what the agent and the officer said to him, and they got it wrong. You say he didn't read the form, but the district court found otherwise. So my concern is we've got findings by the district court on the same evidence that we could see, findings that he had the form, and from the district court's conclusions, he apparently read it and understood it, had an opportunity to understand it. So I assume your argument is that since the district court's relying on the very same evidence we are, we shouldn't give any weight to the district court's findings. But if we do, we've got some, we've got a clearly erroneous standard at that point. And it is clear error. So you are arguing not that we should review it de novo because we look at the same evidence the district court did, but rather the district court's findings that he had enough time and he did read it and did understand it, that those are clearly erroneous. Well, you, the court reviews de novo whether or not he knowingly, intelligently, and voluntarily weighed his rights, but the facts that establish that, yes, you would look at for clear error. The court made a finding of fact that he did read it and he had enough time to understand it. Those are factual findings we would have to conclude clearly erroneous. Correct. And when you look at the video, it is clearly erroneous. You will be left with That's why I'm saying the video is such a dramatic evidence that is stronger than any argument that I can make that he didn't have an opportunity to read it. Okay. Well, I just want to return back to my question that, I mean, are you asking that essentially that we say that you need, there needs to be a time where the defendant is allowed to read and I don't, maybe you don't want to come up with a specific time, but there is a time that is a requirement. That's what I'm trying to, yes. Yes, I agree. I think that's fair. At a minimum, there has to be some indication that there was time for an individual to actually read them, understand them, and appreciate the nature and gravity of the rights that they were waiving. Okay. And when you look at the video. Okay, but, and I appreciate that. But I'm wondering, do you have any case support for that proposition? Can you point me to any case support that says you need to, there needs to be a certain amount of time that the defendant can read and whatever. I don't have a case to offer you to say a certain amount of time. But both Miranda and also Moran, the Supreme Court case, talk about the fact that rights that are waived have to be done knowingly and intelligently. And you can't do that if you don't read. So it's just sort of a common sense argument that at some point, at a minimum, somebody has to have an opportunity to read it. But then really, what the court's concern is, did he understand it? And there's no indication to show that he did understand it. And you have to look at the words of what law enforcement said to him. They miss, they basically, they misadvise him. They don't even tell him that he has a right to an attorney. So I think it's fair to sort of set the written one aside when you look at that video and you see that he never had an opportunity. Did he ever put on any affirmative evidence, I didn't understand what I signed? Well, Mr. Blackburn himself did not testify, but we did put on Ms. Avelis. She's an expert in reading and education. But the district court was fairly unimpressed with her. And I think incorrectly so, for no basis. Well, the basis were that she was given very limited license about what to do. I think the district court was suspicious that she was cabined what to do and not to do. And he felt that restricted her ability to give meaningful work advice to him. I think the issue was, could he possibly have understood his Miranda warnings? And could he have knowingly and intelligently waived them? And so it was just, the only, it was a very discreet issue. He and the government broadened it, but it was a very discreet issue. Could, as it turned out, he's a slow processor and a slow reader. Could a person who's a slow processor and a slow reader, given what you see on the video and given the test that you did of him in his learning capacity, could he possibly have read those warnings and understood those? If we agree with the district court's conclusion to give limited credibility to Ms. Avelis, if we agree with the district court's evidentiary ruling on that, do you lose? I don't think so. I think that helps enforce our position, but I don't even think, I think that's how dramatic the video is and that's how much common sense it is and that's how important the Miranda rights are. I don't think, even, we can't just dismiss those rights as sort of some pro forma thing, as the agent did when he said at the end, now that we're done with this silliness. They're important rights. Of course, by that time, the document had already been signed, so that statement is hard to show to be relevant to his knowledge in signing the form in the first place. Agreed, but it is indicative of how dismissive he was of the importance of the rights and how, and it also indicates, and you see his behavior throughout the video, how minimizing it is that he's just asking him to sign, never asked if he understood those. So, just to finish answering your question, and then I can move on to the seizure issue. I don't think we need Miss Abella, but I think that the judge discarded her for no good reason. She spoke to a specific issue. She was an expert, but even without that, because the truth is, somebody who's well educated and a great reader and a fast reader could not, who was unfamiliar, as there's no evidence, but that he was unfamiliar with the Miranda warnings. There was no evidence either way on that. He had no criminal history. There was no evidence that he was familiar with the Miranda warnings. Well, I mean, there was no evidence either way. I mean, you'd be aware of Miranda just by watching television these days. But that's exactly my point. My point is there was no evidence that he was familiar or that he was unfamiliar. Right, but watching a police TV show and hearing the rights is insufficient, and when you actually look at the wording of the rights that they gave, it's quite different than what they say on TV. They talk about the fact that you, not just that you're entitled to an attorney, but you're entitled to have an attorney during the questioning and that things can be held against you not just in court but in other proceedings. I hope that you all have watched the video or that you will because, again, I think it will be very clear that that's not something that the court is willing to tolerate as far as what's acceptable for Miranda. If there's not another question regarding Miranda, I will move on to the illegal seizure issue. With respect to the illegal seizure issue, the law enforcement agent, as well as Ms. Hatton, had no consent, there was no search warrant, no exigent circumstances, to go into Mr. Blackburn's bedroom and to take his phone. The Fourth Amendment prohibits warrantless seizures, so there clearly was no warrant. They went to the house with no search warrant whatsoever. And there are only very defined, tailored reasons that allow for exceptions to warrantless searches. And we don't have that here. How did they get the telephone? Illegally. Ms. Hatton, who is a drifter and was temporarily staying in the living room who indicated that she and her boyfriend were going to leave shortly, said that Mr. Blackburn had a telephone. She had seen it in his bedroom. She took the agent upstairs. The agent went upstairs to get the telephone. The agent knew that it wasn't Ms. Hatton's bedroom and had no reason to think that she had access to that bedroom. She certainly knew that it wasn't Ms. Hatton's telephone and had no reason to think that she had access to the telephone or permission or consent to take that telephone. But he gave permission for the agents to come in and check on the children. Welfare check. Yeah. And so that permission of a welfare check, why wouldn't that include, if I was going into a house for a welfare check, don't you assume that the person going in would have been given permission to check the bedroom where those children lived? A welfare check is not a blanket authorization to search the house. It's to see how the welfare of the kids are. And one of the ways you answer how the welfare is, you look at the bedroom and see if it's filthy or not. But they'd already done that, right? They'd already done a welfare check of the whole house and they got the kids. Wasn't that more a protective sweep that they had done? No, they did a welfare check. They were looking for the kids. They did a welfare check and a protective sweep at the same time. They got the kids. They got them clothing. They got all the adults sequestered into a room. There was no reason at that point that they couldn't get a warrant. Are you saying that the officers had gone to that bedroom not for the purpose of seeing if there was some lurking person in there, but that they had gone into that bedroom to see if it was clean and sanitary and so forth? I don't think that was what their welfare check was for. That is not what she articulated. Her welfare check was looking for clean and sanitary. They believed that there were victims of child pornography and they were going in to try to see if they could find and identify the children. That wasn't broken out that way. It just went to him and said we're going to do a welfare check of the kids. He said okay. Your Honor, I see I'm over my time. May I answer? You'll have to ask the presiding judge. Thank you. What happened is at 7.15 in the morning, seven law enforcement officers come to the door and Mr. Blackford answers. They say we're here to do a welfare check. He lets them come in. They come in and they do the welfare check. That doesn't give them the basis to do a warrantless search for evidence. That's exactly what they do when they go to the bedroom, that's his bedroom with the children, and they get his phone that there's no argument that it's not his phone. There's nothing about the welfare check that allows, that's not an exception to the warrant requirement for search for evidence. Thank you. Thank you. Thank you. Thank you. May it please the Court. Counsel, my name is Marissa Ong, and I'm an assistant United States attorney in Las Cruces, New Mexico. Blackford advances two arguments on appeal. He went straight into the, I'm sorry, my co-counsel went straight into the Miranda violation, so I will address that first. And Judge Ebell, going off of your question, if you don't disturb the credibility findings of the district court on appeal, the credibility findings with regard to Ms. Ebell, Blackford does lose that issue. All right. Let me ask this question then, because this is a district court making findings of what it has before it, and I think Judge Ebell asked this question earlier. As the court of appeals, where you have recorded evidence such as a video, does the court of appeals judges have the same authority by law in looking for the cases of what you know that says that we have the authority to substitute our judgment for the finding that the trial court made? And, for example, in this video she's talking about. So there you have the video. Do we three, evidentiary-wise, have the authority to say, well, we know that Judge Johnson made this finding. By looking at that video, he's the trial court. We don't agree. That finding is subject to a clearly erroneous review, and you would have to find that there is no support in the record for his finding. What Judge Bullock was asking was, is it a clearly erroneous standard when the evidence that the district judge uses is identical to the evidence that the court of appeals has? Yes, Your Honor. And what's your best case for that? The best case for that, I believe, would be the cases that I cited in my brief with regard to the Miranda waiver, both the Burson and the Curtis case. In both of those videos, the court of appeals had an actual video of the application of the Miranda warnings available to them, and at no point in either Burson or Curtis did this court state that because you have a video available to you, there's a different standard of review. Well, the question was, was the issue raised in those cases, that there should be a different standard of review? Because I'm not sure how presidential that is if that wasn't raised and addressed by the court. Well, that issue has not been raised in this case. Blackburn has never argued that those findings should be subject to a different standard of review. All right, that's a good answer. Thank you. Thank you. With regard to the Miranda waiver, the court also considered the totality of the circumstances. It's not just looking at the video in isolation when the form was given to Blackburn. There's later portions in the video where Blackburn is able to correct the officers if they get something wrong. Every single law enforcement officer that testified stated that they had experience interviewing people with mental disabilities. At no point did Blackburn ever exude... Surely you're not arguing that later incidences might correct an illegal or an unconstitutional act by the officers. I mean, if the initial act was unconstitutional and they violated this constitution, no matter what they may do later on, it's going to change that rule. Saying, oh, yeah, well, no, we now have made it legal. Your Honor, I am not arguing that. What I'm simply saying is that what this court and the Supreme Court has said is that you look at the totality of the circumstances. I agree with that, but I misunderstood your answer a minute ago. Well, Judge Baldock, I'm going off of the district court's factual findings in this case. And part of what the district court found as to why Blackburn did knowingly and intelligently waive his rights was because during later portions of the video, when you're able to observe him, so you're able to observe how he's interacting with law enforcement, if Detective Sabaw said something that was incorrect, Blackburn would correct her. There's portions of the video where Agent Green is showing him different pictures and Blackburn is actually writing on those pictures while Agent Green is talking to him. Well, that evidence goes to support the holding that the district court or the finding that the district court made that it was knowingly and voluntarily. There was nothing wrong with Miranda. And I apologize. I thought you were saying that if we find that initially it was wrong, that then later on that that could be corrected, and I misunderstood you. That's not my argument, Judge Baldock. I apologize if there was any confusion. But all of the things that the district court relied on in this case are supported by the record. Additionally, Kiefer Orfield, one of the individuals that was staying in the home, testified that he had a month to interact with Blackburn and that according to him, Blackburn appeared to be very intellectually there. During law enforcement's entire interaction with Blackburn, he was being cooperative. If there was ever anything that he wanted to correct them for, he would. So it's fair to say that in this case, if he needed more time to review the Miranda waiver, he simply would have said that. At no point during his review of the Miranda waiver does he ever say to law enforcement, hey, I need a minute. And it's worth noting, I have the Statement of Rights form just here with me. These are not overly complicated concepts. He had the form. If you review the video, he had the form for approximately 2 minutes and 14 seconds. And for one of those minutes, he was standing up at a podium as he's initialing by each statement, and there he clearly has the opportunity to read those. Law enforcement did advise him that he didn't have to talk to them and that he could stop talking at any point. So I think that here this court should affirm the district court's findings and hold that he did, in fact, knowingly and intelligently waive his rights. Do you agree that this is one of the, in terms of close to the line issues, that this is one of the more inadequate Miranda advisements that you've seen? Your Honor, it certainly would have been better practice if law enforcement had actually read him the rights. However, the standard is whether Blackburn knowingly and intelligently waived them. He was given the Miranda form that adequately contained all of the rights on it. He was given the opportunity to review it. There was nothing in Blackburn's behavior that would have indicated to the officers at the time that he did not understand what was going on. And so all of the factual findings by the district court are borne out by the record in this case. I didn't mean to say one of the more inaccurate, because that's a question we haven't decided, but what I really meant to say was do you agree that this was less comprehensive and thorough than the typical Miranda warning that we see? I would state that we wouldn't be having this discussion if law enforcement had actually orally read the rights to him. However, the standard is whether or not he knowingly and intelligently waived his rights, and the district court specifically found that he did have adequate time to review the waiver based on the fact that Blackburn never said he needed more time. There's two questions. There's that Escobedo question about whether it was knowingly and intelligently waived the rights or not. And then there's the Miranda kind of formalistic test. Those are two separate issues. Yes, Your Honor. In the case. So is it your position that even if Miranda was violated, technically, that the Escobedo kind of test was not violated, that is, that there was evidence that it was knowingly and voluntarily, and that trumps any formalistic failure to comply with Miranda? If this court were to find that Blackburn did not knowingly and intelligently waive his rights, that there was an actual Miranda violation, then his statements would need to be suppressed. But not the earlier search. That's correct, Your Honor. Not the recovery of the phone. That's the Fourth Amendment issue, which you're going to address next. Yes, and I'm happy to move there unless the court has any additional questions on the Miranda waiver. So with regard to the Fourth Amendment issue, it's important to remember that suppression is not a personal individual right. It's the only, the sole purpose of the Fourth Amendment is to deter, the sole purpose of the exclusionary rule is to deter future Fourth Amendment violations. It should be viewed as a last resort, and it should only be used when there's evidence that law enforcement engaged in reckless, deliberate, and grossly negligent disregard for the Fourth Amendment. That clearly did not happen here. What happens is law enforcement shows up at a residence where they're looking for a young minor child who they know has been sexually abused. Blackburn answers the door. He consents to let them into the home. Immediately, they identify the victim that they've been looking for coming down the stairs. Every law enforcement officer that testified stated, as soon as they saw the victim coming down the stairs, they knew this is the victim, and each one of them also suspected that Blackburn was the perpetrator based on his physical stature because that matched that of the perpetrator in one of the videos. Orfield and the law enforcement officers all testified that everyone was being fully compliant. Law enforcement was not being overly aggressive. They were being calm. Orfield, who's not a law enforcement witness, actually testified that he's a crazy conspiracy theorist, and he was pleasantly surprised by how his interaction with law enforcement was going. He actually stated that he felt like he was talking to friends. So they go into the living room. One of the officers asks Blackburn if he has a cell phone. Blackburn says no. Hatton, who had also been staying at the house, then says, hey, I'd like to talk to you outside. She goes outside and talks to Special Agent Altamirano and says, you know what? I think that Blackburn is molesting the children. She relays a story that had happened a couple days prior and also says, and he's lying to you about the phone. He has one. Special Agent Altamirano then says, oh, you've seen him with it? And she replied, yes, I'll show you. At no point did Special Agent Altamirano ask her to go get the phone. Blackburn and Hatton simply walked upstairs to what appeared to be a children's bedroom, grabbed the phone, gave it to Special Agent Altamirano, who immediately went downstairs. The phone was presented to Blackburn. He immediately gave his consent to search the phone, and Special Agent Langer, the officer who actually took his consent, testified that whenever he gives people these consent-to-search forms, if it even appears to be a close call, then he doesn't bother with the form. He actually stops to get a search warrant. There's no evidence in the record that at that point in time it would have been known to the officers that Special Agent Altamirano was going into Blackburn's room. That's something that they found out later. Well, Kelsey, though, your emphasis on consent, I mean, are you suggesting that consent kind of, you start with a consent and it doesn't matter what happened prior to that? No, Your Honor. I'm saying that the consent in this case further bolsters the fact that there was no improper government action. Help me understand what theory you're putting forward for saying the, more specific than no improper government action. What legal theory? So Blackburn had consented to them coming into the home for a welfare check. At that point, Detective Sabaw goes upstairs with the children. At no point did Blackburn ever tell Detective Sabaw, oh, hey, I said you could come inside, but you can't actually go upstairs. He sees them go upstairs, so he knows that they're up there. If he had any problem with them going upstairs, he could have said something then. So that was part of the initial consent to? To enter the home. To enter the home and perform a welfare check. Yes. Okay, can I get you to respond to your opposing counsel's argument that going to the bedroom, again, was not part of the welfare check? Even if it wasn't part of the welfare check, there was nothing obvious to Special Agent Axel Marano at that time that Patton, who she knew had spent the night in that residence and had been there for several days, did not have a lawful right of access to go up to that bedroom, which appeared to be the children's room. So ultimately, we assess whether or not the officer's actions in this case are reasonable. And there's kind of different overlapping legal theories that tell us that in this case, it was okay. Well, help me understand the legal chain then of your legal theories. What's the chain? We start with consent. So Blackburn consents to law enforcement coming into the house. Patton then tells Alta Marano, hey, I know where Blackburn's phone is, I'll show you. Even if they didn't have consent at that point to go upstairs specifically, which I would argue the consent wasn't limited to them just staying on the ground floor. But at that point, they weren't going up to check on the welfare of the children. They were going up to recover evidence. That was the motivation. She followed Patton up the stairs because she said she was going to show her where the phone was. So she goes upstairs. She doesn't actually go into the bedroom. She's not searching through the bedroom. And so our position is that at that point, it's a private search being conducted by Patton, who then brings her the phone. On the private search cases, though, we've usually upheld those when the private person doing the search had a separate private reason, incentive to do the search apart from the investigative source. For example, on the shipper that didn't want to ship dangerous packages. In this case, Ms. Patton had no private interest in recovering that cell phone except to help the officer. Your Honor, I see that I'm out of time. May I answer your question? You may. Thank you. So she, I think, arguably had a private interest in getting Blackburn out of the house because she knew that he was molesting the children. And just ultimately, we would rely on the inevitable discovery doctrine in this case. If the court has no further questions. It does not appear so. Thank you. Thank you. Case is submitted and counsel is excused.